<u>**NOT FOR PUBLICATION**</u>

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA | HONORABLE KAREN M. WILLIAMS |
| v. | Criminal No. 1:24-cr-00347 (KMW) |
| DARYUS GANDY, | **MEMORANDUM OPINION AND ORDER** |

**THIS MATTER** comes before the Court by way of defendant Daryus Gandy's ("Gandy") Motion to Suppress. (ECF No. 24). The Government has opposed Gandy's Motion. (ECF No. 27). The Court has decided the Motion after considering the written submissions and oral argument. For the reasons that follow, the Court **DENIES** Gandy's Motion.

**I.    Background and Procedural History**

1.   The incident giving rise to Mr. Gandy's arrest occurred on August 17, 2023, in the area of 1600 block of Atlantic Avenue in Atlantic City, NJ. According to Mr. Gandy, Atlantic City Police Department Detectives Christopher Dodson ("Dodson") and Eric Evans ("Evans") dressed in plain clothes, were traveling in an unmarked, grey Dodge Charger police vehicle on Atlantic Avenue. Mr. Gandy contends that based on police body camera footage and subsequent police reports he was arrested and subjected to an unlawful search and seizure because the sole basis for his arrest was limited to the detectives seeing "two males" (Mr. Gandy and Bashon Simon), and a "white man" (John Adams) on the sidewalk on the opposite side of the street. Mr. Gandy describes the sequence of events as follows:

- The detectives report seeing Mr. Gandy loitering and conversing with Adams. They observe Mr. Gandy taking "green U.S. Currency" from Adams.

- They report Mr. Gandy counting this currency and placing it in his black satchel.

- They report they saw Mr. Gandy reaching into his pants pocket, retrieving a plastic bag.

- The detectives also report that they interrupted the drug part of the transaction because they activated their lights and sirens.

- According to Mr. Gandy, on this information alone, detectives pulled an illegal U-turn, jumped out of the car, grabbed Gandy's arm, and directed him to put his hands up and spread his feet.

2. Mr. Gandy contends that the body-worn camera ("BWC") videos demonstrate that the police reports are inconsistent with the events captured by the BWC. For these reasons, Mr. Gandy contends that the Detectives unconstitutionally seized the two of them – Mr. Gandy and Mr. Simon, and then searched their persons and Mr. Gandy's zippered-closed black satchel.

3. The Government contends that Detectives Dodson and Evans:

- Were conducting surveillance near Mount Vernon and Atlantic Avenues in Atlantic City, New Jersey, in an area of the city well-known for its heightened levels of criminal activity and quality of life complaints.

- Were familiar with the area because they, and other members of the ACPD, had previously conducted criminal investigations and made arrests for drug trafficking, homicides, shootings, and assaults, in and around that region of the city. Dodson and Evans submit that while surveilling the 1600 block of Atlantic Avenue, they observed several unidentified individuals approach Mr. Gandy and Mr. Simon on the street.

- Recognized the men because of previous contact they, as well as other officers, had with Mr. Gandy and Mr. Simon during prior drug trafficking investigations. (*See* ECF No. 27, Exhibit A.)

- Recognized that Mr. Gandy and Mr. Simon were conducting what appeared to be hand-to-hand drug transactions.

- Submit that as they surveilled Mr. Gandy and Mr. Simon, they saw the men repeatedly greet unknown individuals.

- Observed Mr. Gandy and Mr. Simon walk southbound on Mount Vernon Avenue with the unknown individuals, exchange some items with the individuals

    (believed to be drugs in exchange for cash), abruptly end the interaction, and then walk in the opposite direction of the unknown individual.

- During one of these hand-to-hand transactions, detectives observed a male, later identified as John Adams, approach Mr. Gandy and Mr. Simon. Detectives watched as Mr. Adams provided Mr. Gandy with an unknown amount of U.S. currency, Mr. Gandy immediately counted the money, placed the cash in his black bag, and finally, retrieved a plastic bag from his pants pocket. According to the detectives, based on their training and experience, as well as their personal observations, the plastic bag appeared consistent in size and manner with how a controlled dangerous substance ("CDS") would be packaged for sale.

4.     The detectives further report that while dressed in police vests, they drove towards the three men in an unmarked police car equipped with lights and sirens. Once the detectives decided to stop the three men, both Dodson and Evans triggered their BWCs. As the detectives left the vehicle and approached the three men on foot, the men ended their interaction and started to walk in separate directions, attempting to avoid police contact. Mr. Simon quickly walked southbound, away from the Detectives and was not apprehended at that time—but Mr. Gandy and Mr. Adams were stopped by the detectives.

- Detective Evans was first to make contact with Mr. Gandy, who acted confused and held what appeared to be a cigarette he was in the process of preparing. Detective Dodson approached Adams at the same time.

- The detectives told Mr. Gandy and Mr. Adams to put their hands up and informed them that they were being stopped for a "CDS investigation."

- As Mr. Gandy had his hands on a wall, Detective Evans removed Mr. Gandy's bag from his person.

- Detective Evans felt the bag, opened it briefly without fully searching it, confirmed there was a firearm inside based on his feeling the bag, told Detective Dodson, and Detective Dodson placed Mr. Gandy in handcuffs.

- As Mr. Gandy was being placed into custody, the detectives gave a description of Mr. Simon and his attire over police radio to responding units.

- After hearing that officers were looking for Mr. Simon, Mr. Gandy began shouting down the street to Mr. Simon to warn him to depart the area.

5.  During a subsequent search of Mr. Gandy's bag, detectives found a black .38 caliber Ruger LCP handgun, bearing serial number 371575824, which was loaded with five live rounds, including one in the chamber. In Mr. Gandy's pockets, detectives found 82 wax folds/packets containing an off-white powdery substance, 5 white pills, 6 blue pills, and $119 in U.S. currency. Mr. Gandy was arrested on state charges and transported to the Atlantic County Jail for processing.

6.  All the evidence seized from Mr. Gandy, including the firearm and the suspected narcotics, were sent to the New Jersey State Police Lab. The drug lab report concluded that the 82 wax folds tested positive for fentanyl and the pills tested positive for non-opiate prescription drugs.

7.  On August 23, 2023, the firearm was tested by a ballistician with the New Jersey State Police Office of Forensic Sciences, Ballistics Unit and it was found to be operable and capable of discharging a projectile by action of an explosion.

**II.  Motion to Suppress**

8.  In Mr. Gandy's motion to suppress evidence he seeks to suppress "all evidence seized" which appears to be the firearm and ammunition seized from the black bag as well as the controlled dangerous substances taken from his person. Mr. Gandy and the Government submit various documentary and video exhibits in support of and in opposition to suppression.[1] The Court also considers testimony and evidence presented during the October 8, 2024 evidentiary hearing. (The transcript will be cited to as "Tr.").

---

[1] In support of suppression, Mr. Gandy submits his own affidavit ("Gandy Aff.") (ECF No. 24-1, Exhibit C); an arrest report of Detective Eric Evans dated August 17, 2023 (ECF No. 24-1, Exhibit B); and BWC footage depicting events before and during his arrest (ECF No. 24-4, Exhibit A). In opposition to suppression, the Government submits police reports relating to Mr. Gandy and Mr. Simon (ECF No. 27, Exhibit A); ACPD Policy Temporary Suspension (*id.*, Exhibit B); and BWC footage.

9.     The Government produced Detective Evans, the BWC video depicting the events of August 17, 2023, and arrest reports of Mr. Gandy and Mr. Simon.

### a. Findings of Fact

10.    These findings pertain only to the instant Motion. The Court will outline relevant facts based on Detective Evans description of the events of August 17, 2023 as outlined in the arrest report; the BWC video capturing the events; the testimony of Detective Evans and evidence presented during the October 8, 2024 hearing. In particular, the Court will detail the facts right before, during, and after the alleged narcotics transaction, as follows:

    a.     While surveilling the area of the 1600 block of Atlantic Avenue in Atlantic City, NJ, Atlantic City Police Department Detectives Dodson and Evans observed a number of what they believed were hand-to-hand CDS transactions. The detectives were conducting roving surveillance in the area of Atlantic Avenue anywhere from the 1600-block to the 1500 block, which included Mount Vernon Avenue. (Tr. 7:13-8:23.)

    b.     Detective Evans testified that during his nine years as a detective with ACPD he has made about 500 drug arrests in this area and between 20 and 30 firearm-related arrests. (Tr. 10:6-11:2.)

    c.     Detective Evans testified that while wearing his police vest and badge and using binoculars he observed Bashon Simon and Daryus Gandy on Mount Vernon Avenue exchanging money for plastic bags containing white wax folds which he knew from his training and experience to be consistent with controlled dangerous substance heroin. (Tr. 7:23-9:20.)

    d.     Detective Evans both in his arrest report and during his testimony indicates that he recognized Gandy and Simon based on prior police intelligence and arrests. (Tr. 8:17-21, 11:10-17; ECF No. 24-1 at 33.) In addition, Government Exhibit A confirms that prior to August 17, 2023, Gandy was arrested by officers with ACPD on three occasions: October 23, 2017, for possession of heroin, resisting arrest, and hindering apprehension; March 12, 2019, for possession of cocaine and heroin, possession with intent to distribute cocaine and heroin, and distribution of cocaine and heroin within a school zone; and October 16, 2019, for possession of cocaine and heroin, possession with intent to distribute cocaine and heroin, and distribution of cocaine and heroin within a public zone. In addition, Mr. Simon was previously arrested several times by ACPD prior to August 17, 2023.

  e. Detective Evans further testified that when Dodson began to maneuver the vehicle in the direction of Mr. Simon and Mr. Gandy, the two observed the detectives and in response Mr. Gandy remained in place and Mr. Simon began walking quickly southbound. (Tr. 11:20-12:2.) According to Evans, he did not engage his body cam until after Dodson began maneuvering the vehicle towards Mr. Gandy and Mr. Simon. (Tr. 12:7-17.)

  f. Detective Evans testified that after seeing multiple hand-to-hand CDS transactions, his intent "was to stop and search him and ultimately arrest him." (Tr. 16:11-17.)

  g. Detective Evans asserts that because he intended to make an arrest, he removed Mr. Gandy's satchel from his body and searched his pockets to make the scene safe. (Tr. 16:21-17:6.)

  h. Detective Evans further asserts that when he grabbed the black satchel, he felt the bag and felt what he believed to be a firearm. The BWC confirms this, after removing the satchel from Mr. Gandy the video depicts Evans squeezing the bag then calling out to Detective Dodson for support, proceeding to open the bag, confirm the firearm and then state, "you're being detained." (BWC 15:48:20–15:49:06.) Thereafter, Detective Evans opened the satchel and found a firearm.

  i. Detective Dodson proceeded to search Gandy incident to his arrest and discovered a plastic bag containing CDS (heroin) in Gandy's pants pocket. (Tr. 18:24-19:12.)

### b. Conclusions of Law

11. Based on the foregoing facts, the Court makes the following conclusions of law:

  a. Federal Rule of Criminal Procedure 41(h) provides that "[a] defendant may move to suppress evidence in the court where the trial will occur, as Rule 12 provides." Fed. R. Crim. P. 41(h). A motion to suppress evidence must be raised before trial. Fed. R. Crim. P. 12(b)(3)(C).

  b. Mr. Gandy seeks suppression of the evidence on the basis that the detectives did not have reasonable suspicion to stop him. The Fourth Amendment prohibits unreasonable seizures and searches. U.S. Const. amend. IV. "'Generally, for a seizure to be reasonable under the Fourth Amendment, it must be effectuated with a warrant based on probable cause.'" *United States v. Brown*, 448 F.3d 239, 244 (3d Cir. 2006) (quoting *United States v. Robertson*, 305 F.3d 164, 167 (3d Cir.2002)). There are, however, exceptions to the warrant requirement. An exception relevant here was established in *Terry v. Ohio*, 392 U.S. 1 (1968), announcing that "'an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot.'" *Id.* (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). "Any evidence obtained pursuant to an investigatory stop

6

(also known as a '*Terry* stop' or a 'stop and frisk') that does not meet this exception must be suppressed as 'fruit of the poisonous tree.'" *Id.* at 244. There is no Fourth Amendment violation until there is a seizure. *United States v. Valentine*, 232 F.3d 350, 358 (3d Cir. 2000). Thus, the Court must first determine when the seizure occurred and then "evaluate the presence or absence of reasonable suspicion," considering "only 'the facts available to the officer at the moment of the seizure.'" *Brown*, 448 F.3d at 245.

        c.    **Seizure**. The point at which Mr. Gandy was seized must be determined at the outset because it decides which facts the Court can consider. Detective Evans submits and the BWC reflects that Mr. Gandy was seized when the detectives exited the vehicle and say, "Yo come here," and Mr. Gandy complied. (Tr. 14:23-16:10; BWC 15:48:20.)

        i.    A seizure requires either physical force or, absent force, a show of authority. *California v. Hodari D.*, 499 U.S. 621, 626 (1991). A show of authority, such as ordering a person to stop, may constitute a seizure if two elements are present: (i) a reasonable person would not feel free to leave; and (ii) the person actually yielded to the show of authority. *Id.* at 625–29.

        ii.    Here, Mr. Gandy was seized after the detectives exited their vehicle and Mr. Gandy understood he was not able to move freely and instead submits to the detectives' instruction to "face the wall." (BWC 15:49:06- 15:49:11.)

        d.    **Reasonable Suspicion**. Mr. Gandy argues that the detectives lacked reasonable suspicion to stop him. (Def.'s Br. at 8-16, ECF No. 24-1.) In essence, Mr. Gandy argues that because the BWC footage depicts Detective Evans holding up the binoculars and within seconds proceeding to effectuate the stop, and since the articulated basis for reasonable suspicion was previous observations of hand-to-hand transactions that are not depicted in the BWC footage, the arrest report is inconsistent with the BWC footage. (Def's Br. 4-6, ECF No. 24-1.) For this reason, Mr. Gandy argues, the Court should find that there was no reasonable suspicion to stop him in the first instance. (*Id.* at 4-6, 12-16.) Moreover, in his Affidavit Mr. Gandy swears: "I was rolling a cigarette when two narcotics officers jumped out of a car and ordered me against the wall. I did not notice them until they jumped out of the car. (Gandy Aff. ¶¶2-3, ECF No. 24-1). "The cops immediately put me against the wall and took my bag off my person." (*Id.* ¶5).

        i.    Reasonable suspicion is less than probable cause but is more than a mere "hunch." *Terry*, 392 U.S. at 27. A court must "look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)). "An officer's objective basis for suspicion must be particularized because the 'demand for specificity in the information upon which police action is predicated is the central teaching of this Court's Fourth

7

Amendment jurisprudence.'" *United States v. Brown*, 448 F.3d 239, 246 (3d Cir. 2006) (citing *Terry*, 392 U.S. at 22 n. 18).

  **ii.** This fact-intensive inquiry draws on the observations of the officer as analyzed against his training and experience. *Id.* Indeed, "officers [may] draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Id.* (quoting *Cortez*, 449 U.S. at 418). Additionally, courts have considered circumstances like a suspect's presence in a high-crime area, presence on a street at a late hour, or nervous, evasive behavior or flight from the police. *United States v. Brown*, 448 F.3d 239, 251 (3d Cir. 2006).

  **iii.** The Government urges the Court to consider the following factors in assessing reasonable suspicion: Mr. Gandy's presence in a high crime area; that Mr. Gandy and Mr. Simon were known to the detectives; Detective Evans' observations of Mr. Gandy and Mr. Simon engaging in multiple hand-to-hand transactions immediately prior to arrest; the collective experience and specialized knowledge of the officers with respect to their observations of several transactions they believe were consistent with hand-to-hand drug transactions. (Gov't Br. 2-3, 6-7.)

  **iv.** The Court finds that reasonable suspicion existed for the stop:

1. **Reports of narcotics in the area**. The Court considers that the Government has established that the area of the incident is a "high crime" area.

2. **The suspected hand-to-hand transactions**. The Court finds credible the police reporting that Evans observed Mr. Gandy and Mr. Simon engaging in a suspected hand-to-hand transaction. Mr. Gandy raises several discrepancies between the testimony, the surveillance footage, and the arrest report but the Court finds these discrepancies are explained by the testimony of Detective Evans and his clarification that the BWC was not activated until the detectives decided to arrest Simon and Gandy.

3. The Court understands that law enforcement officers need not be totally correct in their factual observations—they need only be reasonable. *See United States v. Fleetwood*, 235 F. App'x 892, 895–96 (3d Cir. 2007). Here, the Court finds that based on their observations during surveillance it was reasonable for Dodson and Evans to approach and initiate an arrest of Simon, Gandy, and Adams.

8

e. **Warrantless Search of the Black Bag.** Mr. Gandy argues that the contents of the black bag should be suppressed based on the warrantless search of the bag and that the detectives lacked reasonable suspicion to search his black bag. The Government submits that the search was conducted incident to arrest.

   i. **Good Faith Basis-Search Incident to Arrest**: "[W]hen an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape." *United States v. Myers*, 308 F.3d 251, 266 (3d Cir. 2002). "This exception to the general warrant requirement arises from a commonsense acknowledgment of the dynamics of an arrest, the right of privacy, and the need to allow police officers to protect themselves." *Id.* "It is a carefully tailored and narrowly crafted license that addresses the tension between the need for effective law enforcement on the one hand, and constitutionally guaranteed liberty on the other. Accordingly, the scope of such a search must be 'strictly tied to and justified by the circumstances which rendered its initiation permissible.'" *Id.* "A search incident to arrest is therefore only 'reasonable' within the meaning of the Fourth Amendment when it is confined to, and controlled by, the circumstances that warrant the intrusion. Thus, although it might appear 'reasonable' for an arresting officer to conduct a search that is as broad as possible following an arrest, the Constitution does not allow it." *Id.* A legitimate search incident to arrest is limited to the arrestee's person and to the area within his immediate control, meaning the area from which he might gain possession of a weapon or destructible evidence. *Id.* at 267.

   ii. Here, for purposes of the instant Motion, it is clear that Detective Evans' search of the black bag is incident to arrest. Detective Evans with the aid of the BWC testified that at this point he was detaining Mr. Gandy for arrest, which precedes Detective Evans removing the satchel from Mr. Gandy. (Tr. 16:11-19:4.) Indeed, the BWC depicts Detective Evans feeling the firearm through the bag, signaling for Dodson to come over and secure Mr. Gandy, opening a second bag within the black bag and then stating, "you're being detained." (BWC 15:49:06-15:49:11.) Thus, it appears clear that this search was conducted incident to arrest on the CDS and elevated to a firearms arrest upon its identification and the detective's personal knowledge of Mr. Gandy's prior criminal history.

For the reasons set forth above, and for good cause shown, Mr. Gandy's Motion to Suppress is **DENIED.**

9

## ORDER

IT IS this /2th day of **November**, **2024**, hereby

**ORDERED** that Defendant's Motion to Suppress (ECF No. 24) is **DENIED**.

                                                    KAREN M. WILLIAMS
                                                    UNITED STATES DISTRICT JUDGE